***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties. *Page 2 
2. An employment relationship exists between plaintiff and employer-defendant at all times relevant herein.
3. Travelers Indemnity Company was the carrier on the risk.
4. Pursuant to a Form 22 completed by defendant-employer, plaintiff's average weekly wage was $408.01, yielding a weekly compensation rate of $272.02.
5. The following stipulated exhibits were entered into evidence:
 (a) Pre-Trial Agreement marked as "Stipulated Exhibit No. 1";
 (b) All medical records, correspondence and Industrial Commission forms and filings were collectively marked as "Stipulated Exhibit No. 2"; and
 Payroll records from Employer-Defendant marked as "Stipulated Exhibit No. 3".
6. Subject to verification from the payroll records of defendant Wilson-Finley Co., Inc., plaintiff did not perform any work for the defendant employer for approximately 3-4 months from in or about October 2003 to in or about January 2004.
7. Subject to verification from the payroll and employment records of defendant Wilson Finley Co., Inc., plaintiff missed all or part of a day of work for that same defendant employer to attend and obtain medical treatment from one or more medical providers in connection with the alleged injury by occupational disease that he has alleged in this claim on at least 11 and 13 August 2003, 22, 24, and 26 September 2003, 23 February 2004, 3, 22, 24, 26, and 31 March 2004, 2, 15, and 22 April 2004, 5, 12, 17, 19-20, and 26 May 2004, 23 June 2004, 2 and 15 July 2004, 25 August 2004, 29 September 2004, and 11 October 2004.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff was born on March 12, 1953. Plaintiff did not complete high school and cannot read or write well. Plaintiff has significant experience in the performance of semi-skilled jobs including positions as a heavy equipment mechanic, as a deep mine coal miner, and as an automobile body mechanic.
2. Since 1998, plaintiff has been and continues to be employed by defendant-employer as a heavy equipment mechanic. This position exposes plaintiff to rubber, including the rubber seals on the aislers and the rollers in the heavy equipment tracks. During the normal course of plaintiff's regular employment, plaintiff would handle these seals for 15-30 minutes approximately three or more time a week. Replacing the seals requires that plaintiff use a clear liquid compound that contains diethyl ether to soften the seals so that they can be pounded into the bushings used with the heavy equipment. In the course of that process, the clear liquid compound mixes with the black rubber dust on the seals and/or bushings. During the course of plaintiff's employment, plaintiff's hands became and remained covered with a black coating consisting of diethyl ether liquid and black rubber dust.
3. Plaintiff's position requires handling rubber air hoses for several hours each day when using the air gun in order to remove and replace nuts and bolts and handling rubber welding cables two or three times a week for approximately an hour.
4. On July 28, 2003, plaintiff was working on bulldozer tracks in the back shop at the Wilson Finley shop. Plaintiff was replacing rubber stoppers as described above for more than four hours, which was more than the number of bulldozer tracks that he normally worked on during a regular day's work. *Page 4 
5. Plaintiff testified that in a matter of days, both of his hands were burning, had cracked and swelled, and were bleeding. Plaintiff continued in his position with defendant-employer as a bulldozer mechanic, with the exception of approximately three months from the middle of October 2003 to the middle of January 2004.
6. Before July 28, 2003, plaintiff had not experienced any problems with his hands of any kind.
7. Plaintiff sought medical treatment for the condition of his hands with Dr. Mohammad H. Baloch, M.D. of Capital Physicians Group on August 11, 2003. At the time of his examination, Dr. Baloch reported "post inflammatory dermatitis" with "blisters, urtcaria, skin texture change, pruritus and rash" in the fingers and palms "with painful stiffness". Based upon this examination Dr. Baloch ordered a prescription for a "systemic corticosteroid", hydrochlorothiazide with prevacid, a medrol steroid dosepak, and a steroid cream, temovate. His "working diagnosis" at that time was "contact dermatitis due to caustic agent".
8. On August 13, 2003, Dr. Baloch again examined plaintiff, and again reported "post inflammatory dermatitis" with "skin texture change, pruritus and rash" in the fingers and palms. However, Dr. Baloch noted that the "oedema" in plaintiff's hands was "markedly improved" and that the "blisters have healed". Nevertheless, plaintiff's skin on the palms of his hands was "scaly with edema" in appearance. Dr. Baloch did not change his "working diagnosis" from his original examination.
9. When the dermatitis condition of his hands continued after his last visit to Dr. Baloch, Plaintiff sought treatment from Dr. Gregory J. Wilmoth, M.D. at The Dermatology and Skin Cancer Center in Raleigh on September 22, 2003. Dr. Wilmoth is a board-certified dermatologist and has practiced dermatology in Florida and in the Raleigh area since 1993. *Page 5 
10. Dr. Wilmoth initially noted that plaintiff "has had a poor response to systemic corticosteroids in the form of intramuscular injections and Medrol Dosepaks", and "very little benefit from hand creams". Dr. Wilmoth's assessment was chronic hand dermatitis or psoriasis and further indicated that plaintiff's skin problems could represent an allergic contact dermatitis and recommended skin patch testing that would identify any allergens.
11. On September 24, 2003, plaintiff followed up with Dr. Wilmoth after a 48-hour patch test that revealed no evidence of reactions to the chemicals tested. Dr. Wilmoth suspected plaintiff may have a contact allergy but could not identify the cause of the reaction. Dr. Wilmoth also could not state whether plaintiff's hand dermatitis originated from an irritant, an allergic reaction, or was idiopathic since all of the patch tests were negative. Plaintiff also underwent a patch test using ether, starting fluid and other materials used in his workplace that produced no reaction.
12. On October 14, 2003, Dr. Wilmoth recommended that plaintiff stay out of work since his hand dermatitis had been present for several months with a poor response to systemic cortisteroids and other medications.
13. On December 31, 2003, plaintiff presented to Dr. Wilmoth stating that he was having some residual breaking out of his hands after tapering off of the Prednisone medication. Dr. Wilmoth assessed that the cause of his chronic hand dermatitis is still unknown and since plaintiff was not working, he was unsure of what was generating the dermatitis. Dr. Wilmoth indicated that plaintiff had a strongly active idiopathic dermatitis but he did not exclude an allergic reaction.
14. Overall, while plaintiff was out of work between October 2003 and January 2004, the condition of his hands improved considerably. On January 12, 2004, it was noted that *Page 6 
plaintiff's hand condition was "80% improved". Within three to four days after returning to work, plaintiff's dermatitis began to flare up again.
15. On May 12, 2004, plaintiff presented to the Skin Surgery Center and sought treatment with Dr. Elizabeth Sherertz on referral from Dr. Wilmoth for evaluation of his hand dermatitis. Plaintiff presented with symptoms of blisters with itching on his hands, which were cracked and swollen. Plaintiff also developed dermatitis on his left hip and thigh, which he testified were not exposed to his work environment. Plaintiff stated that no other co-workers had the same or similar severity of contact dermatitis and Dr. Sherertz assessed that plaintiff probably had allergic and irritant contact dermatitis with possible relation to his workplace exposure.
16. Following an extensive patch test series, Dr. Sherertz diagnosed plaintiff with contact allergies to thiuram and carba mixed compounds. Plaintiff was diagnosed with chronic hand dermatitis with positive patch test reactions to rubber accelerators. Plaintiff was counseled on the possible exposure at home to rubber compounds and he also was instructed to avoid handling rubber materials at work.
17. Dr. Wilmoth testified that plaintiff's employment placed him at increased risk of developing contact allergic dermatitis on his hands. Dr. Wilmoth testified that plaintiff's particular occupation and exposure to rubber makes his risk of developing contact dermatitis higher than members of the general public. Dr. Wilmoth further testified that "the higher number of exposures that a person has will increase their chance of becoming allergic."
18. In her deposition, Dr. Sherertz testified that she believes that plaintiff's dermatitis is connected to his employment due to the sudden onset of the condition, location of the outbreak, and repeated exposure to substances at work that are known to be capable of causing *Page 7 
this condition. Dr. Sherertz testified that the cumulative effect of plaintiff's exposures to the chemicals in his employment caused plaintiff's dermatitis. Dr. Sherertz testified that plaintiff's employment placed him at increased risk of developing this condition and represented a significant causal factor in the development of this condition.
19. Stephen Carpenter, a vocational expert, administered various tests to plaintiff, the results of which indicated that plaintiff is functionally illiterate, has difficulty with complex, detailed work, fast-paced or repetitive work involving manipulation of his upper extremities, and difficulty with memory and concentration. Mr. Carpenter indicated that he was unaware of any heavy equipment mechanic position in the regular labor market that does not involve exposure to rubber. Mr. Carpenter opined that plaintiff is unlikely to locate suitable employment so long as he suffers from the dermatitis.
20. Plaintiff's employment increased plaintiff's risk of the onset of chronic bilateral hand allergic contact dermatitis to rubber accelerators containing a mixture of carbamates and/or a mixture of thiuram chemicals as compared to the risk posed by the performance of the normal activities of daily life by members of the general public.
21. The onset of chronic bilateral hand allergic contact dermatitis in plaintiff in July 2003 was not caused by personal allergic reactions or unusual sensitivities to certain rubber accelerators containing a mixture of carbamates and/or a mixture of thiuram chemicals.
22. The greater weight of the evidence shows that plaintiff's work-related exposure to rubber accelerators and other rubber compounds either caused or significantly contributed to plaintiff's chronic bilateral hand allergic contact dermatitis beginning in July 2003.
23. So long as plaintiff continues his employment with defendant-employer, plaintiff's chronic bilateral hand allergic contact dermatitis is not at maximum medical improvement *Page 8 
("MMI"). Furthermore, even if plaintiff terminates that employment, plaintiff will require additional medical treatment to stabilize the condition of his hands after he terminates that employment. Both his treating physician, Dr. Wilmoth, and the consulting occupational dermatologist, Dr. Sherertz, recommended and continue to recommend that plaintiff obtain employment in some occupation in which "he not work with his hands where he would be exposed to rubber compounds." However, if, for any reason(s), that is not possible and plaintiff is required to continue in his present or similar employment that involves exposure to rubber accelerator compounds, Dr. Wilmoth opined that his disability is directly related to exposure. Dr. Wilmoth opined that during an outbreak, plaintiff would be assigned a permanent partial impairment rating of 80% to both of plaintiff's hands. Dr. Wilmoth further opined that if "plaintiff avoids all rubber compounds and his hands are clear, then he does not have any permanent impairment."
24. According to the credible hearing testimony of both plaintiff and Doug Smith, a supervisor of plaintiff, defendant-employer modified the regular duties of plaintiff so that he no longer has to perform any of the work tasks which would expose him to rubber compounds. According to the credible hearing testimony of that same supervisor, Doug Smith, defendant-employer has not hired and would not hire any new employee to work as a heavy equipment mechanic if that employee were not able to perform the work tasks involving rubber compounds.
25. Defendants have provided no evidence that any of the jobs that defendant-employer assigned to plaintiff to perform in the time period after July 2003 and continuing through the present date are jobs that were or are "ordinarily available in the competitive job market." Plaintiff has provided undisputed and credible expert vocational evidence that the modified job described herein was not one that was available in the competitive job market in the geographic area in which plaintiff resides. *Page 9 
26. Plaintiff's employment exposed him to a greater risk of contracting chronic bilateral hand allergic contact dermatitis than members of the general public.
27. The greater weight of the evidence shows that plaintiff's employment caused or significantly contributed to plaintiff's condition.
28. Defendant has not engaged in stubborn, unfounded litigiousness during the course of defending this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the development of the disease. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368, disc. rev. denied, 351 N.C. 473, 543 S.E.2d 488 (2000). Where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition.Futrell v. Resinall Corp., 151 N.C.App. 456, 566 S.E.2d 181 (2002),aff'd per curiam, 357 N.C. 158, 579 S.E.2d 269 (2003); Norris v. DrexelHeritage Furnishings, Inc., 139 N.C.App. 620, 534 S.E.2d 259 (2000),cert. denied, 353 N.C. 378, 547 S.E.2d 15 (2001).
2. A disease is "characteristic" of the profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. *Page 10 Booker v. Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979). "Peculiar to the occupation" as used in subdivision (13) of N.C. Gen. Stat. §97-53, means that the conditions of the employment must result in a hazard that distinguishes it in character from the general run of occupations and is in excess of that employment in general. Keller v.City of Wilmington Police Dept., 65 N.C. App. 675, 309 S.E.2d 543
(1983).
3. Plaintiff suffered a compensable occupational disease in accordance with N.C. Gen. Stat. § 97-53(13).
4. Plaintiff is entitled to appropriate disability benefits at the rate of $272.02 during the time periods that was out of work, between October 2003 and January 2004 pursuant to N.C. Gen. Stat. § 97-29.
5. Defendants have not met their burden to show that the modified employment that defendant-employer offered and continues to provide to plaintiff was and is a job that was and is "ordinarily available in the competitive job market." See Saums v. Raleigh Community Hospital,346 N.C. 760, 487 S.E.2d 746, 750 (1997).
6. As the result of his compensable occupational disease, plaintiff is entitled to have defendants pay for all related medical expenses incurred. N.C. Gen. Stat. §§ 97-25; 97-25.1.
7. As defendant's actions in the course of litigation of this case do not constitute stubborn, unfounded litigiousness, defendant is not responsible for payment of plaintiff's attorney's fees. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following: *Page 11 
 AWARD
1. Defendants shall pay plaintiff temporary total disability at the rate of $272.02 for the time period that plaintiff was actually out of work from October 2003 until January 2004, subject to verification from wage records. This amount has accrued and shall be paid in a lump sum to plaintiff, less the attorney's fee awarded herein.
2. Defendants shall pay medical expenses incurred or to be incurred as a result of plaintiff's compensable occupational disease as are reasonably necessary to effect a cure, provide relief, or lessen the period of disability.
3. Plaintiff's counsel is entitled to receive attorney's fees in the amount of twenty-five percent (25%) of the sums recovered by plaintiff. This amount shall be deducted from the amount owed plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs. This shall include an expert witness fee of $150.00 to Mr. Carpenter.
This the 8th day of December, 2006.
 S/________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 12 
 S/______________ THOMAS J. BOLCH COMMISSIONER *Page 1